UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-173-01 (PJS/DTS)

UNITED STATES OF AMERICA,

          Plaintiff,

v.

ANTON JOSEPH LAZZARO,
A/K/A TONY LAZZARO,
A/K/A "TONY,"

          Defendant.

**GOVERNMENT'S POSITION ON**

**DEFENDANT'S SENTENCE**

**[REDACTED]**

The United States of America, by and through its undersigned counsel, hereby submits its Position on Defendant's Sentence in this case. The government is requesting a sentence of 360 months (30 years) for Anton Joseph Lazzaro followed by 10 years of supervised release and restitution to his trafficking victims.

Anton Lazzaro is a dangerous man. He is a predator who is particularly dangerous because of his ability to hide in plain sight. Which is what Lazzaro did for many years. Lazzaro had a public face and a private one. In public, he appeared to be rich, successful, and powerful—even, at times, charming. But in private, he used his wealth and privilege to obtain what he wanted: sex with minor girls under the age of eighteen.

At trial, Lazzaro's true nature was revealed. Lazzaro paid a recruiter tens of thousands of dollars to locate minor victims to have sex with him. But, as the Court saw, Lazzaro did far more than that. Lazzaro picked out physically small and emotionally vulnerable victims, who Lazzaro called "broken girls." He alternatively impressed them,

flattered them, gave them cash and presents, and plied them with alcohol.  Some victims required more grooming, some less.

Lazzaro praised and plainly emulated Jeffrey Epstein, the world's most infamous sex trafficker of minors.  Near the end of trial, Charles Bittman, Lazzaro's former business associate, came forward with text messages and photos sent to him by Lazzaro.  What Bittman sent the government—what the Court saw at trial—was chilling.  There were photos and videos that Lazzaro took and kept of his victims.  But perhaps the most disturbing exchange was when Lazzaro was expecting a group of underage girls—14- and 15-year-old girls he spirited away from a slumber party in the middle of the night, out from under their parents' noses, to Lazzaro's home nearly an hour away.  Charles Bittman said, "The package is arriving," and "Send pics of the girls!"  Lazzaro responded, "I will try haha … Breaking them in Charles … This is the art ... Of the tart … They are quite lovely I must say."

Lazzaro was the hunter and these 14- and 15-year old girls were the prey.  Lazzaro ended his text exchange with a photo of Jeffrey Epstein captioned "RIP my brother."  Lazzaro is every parent's worst nightmare, and the reason that federal laws protect minors under the age of eighteen.

On top of his reprehensible conduct, while committing his crimes—then again during his criminal case and at trial—Lazzaro obstructed justice.  He offered his co-defendant money to lie for him.  He lied with abandon on the witness stand.  And, of course, at no point has Lazzaro expressed a single shred of remorse.  Because—as evidenced by

his conduct—Lazzaro has no remorse and has no respect for the criminal justice system. He is well-deserving of a thirty-year sentence.

## BACKGROUND FACTS

The following undisputed facts were established at trial and are set forth in the Presentence Report (PSR). ECF No. 415.

## I.   OFFENSE CONDUCT

From May to December of 2020, Lazzaro recruited, enticed, harbored, transported, obtained, maintained, patronized, and solicited at least five girls under the age of 18 and paid them to have sex with him, thereby causing the girls to engage in commercial sex acts. Lazzaro committed these offenses with his co-defendant, Gisela Castro Medina, an 18-year-old who was completing high school at the time she met Lazzaro in May 2020. Over the course of the next year, Lazzaro provided Castro Medina with more than $50,000 for her efforts in finding new girls for Lazzaro to have sex with. These included the five brave teenagers who testified before the Court at Lazzaro's trial. As detailed in their testimony and victim impact statements, Lazzaro's actions in trafficking these high school students for his own sexual gratification has left deep emotional scars that, for some, changed the course of their lives. To achieve justice for these victims and deter others from engaging in this type of sexual exploitation, the Government recommends a 30-year sentence for Lazzaro.

## Victim A

Victim A became friends with Castro Medina when Victim A was 16 years old and Castro Medina was 18, but before either of them met Lazzaro. Tr. Vol. IV at 787–88. In

May 2020, the girls each created a profile on Seeking Arrangement, a sugar daddy website. *Id.* at 788.  Castro Medina connected with Lazzaro on Seeking Arrangement and soon began texting with him on Snapchat, a messaging application.  *Id.* at 790.  Lazzaro asked for a selfie while Castro Medina was in the car with Victim A, so the two girls sent him a picture.  *Id.*  In return, Lazzaro sent Castro Medina $50, for cheeseburgers, setting a transactional tone to the relationship from the outset.  Tr. Vol. II at 276 (Castro Medina testifying that Lazzaro "said he would give us money for food *in exchange for* a picture of our faces" (emphasis added)).

Lazzaro then invited Castro Medina to his condo in downtown Minneapolis.  Castro Medina asked "if it was okay for [her] to bring [her] 16-year-old friend [(Victim A)] along.  And he said it was perfectly fine."  *Id.*  Lazzaro ordered an Uber to bring the girls from Castro Medina's grandmother's home in Maple Plain to the Hotel Ivy in downtown Minneapolis on May 13, 2020.  Gov. Ex. P-1.  During that first visit, Victim A told Lazzaro that she had just gotten out of a residential treatment program for mental health and substance abuse issues.  Tr. Vol. IV at 794.  Lazzaro's response to that information was to pour the girls shots of vodka and give them champagne.  *Id.*  As the girls became intoxicated, Lazzaro pulled out "stacks" of money and shared the menu of sex acts that the girls could perform to get paid.  *Id.* at 797.  Victim A and Castro Medina declined to kiss each other for money on that night, but Victim A did agree to take her top off.  *Id.*; Tr. Vol. II at 286.  Lazzaro then had sex with both Victim A and Castro Medina, and paid them in hundred dollar bills.  Tr. Vol. IV at 798.

After leaving Lazzaro's condo in the car he ordered for them, the girls texted each other. Castro Medina asked Victim A, "why didn't we get that stack?," referring to the stack of bills that Lazzaro had shown the girls. Gov. Ex. A-8; Tr. Vol. II at 319. Victim A responded that it was because the girls "didn't make out" with each other as Lazzaro had requested. Gov. Ex. A-8. Castro Medina expressed disappointment, *id.*, and when the girls returned to the condo on May 15, 2020, the girls did make out with one another to get more money. Tr. Vol. IV at 802. Lazzaro videotaped the kiss as he cheered, "There we go!" in the background, clearly a fan of what he was purchasing. Gov. Ex. A-12. Once again, Lazzaro provided the girls with enough alcohol that they lost full control of their faculties and only then proceeded to have sex with both of them. Tr. Vol. II at 309; Tr. Vol. IV at 800–01. Again, Lazzaro paid the girls in large bills.

Victim A returned to Lazzaro's apartment on other occasions through the late spring of 2020. On each of these trips, Victim A had sex with Lazzaro and received payment in the form of money that she was to give to Castro Medina. Tr. Vol. IV at 806, 810. While Lazzaro was having sex with her, Lazzaro would tell Victim A that he would provide for her, making sure she had food and shelter. *Id.* at 808. He said things like "I can't believe I'm fucking your 16-year-old pussy" and refer to Victim A's "16-year-old body." *Id.* Victim A believed it to be "a very big turn-on to him to mention [her] age as a minor and then fuck [her]." *Id*. Victim A, on the other hand, would disassociate during sex. *Id.* Unhappy with her lack of reaction, Lazzaro would forcibly move Victim A's head and face to ensure she was watching the two of them in the large mirror hanging over Lazzaro's bed. *Id*. at 809.

5

On July 29, 2020, Victim A reached out to Lazzaro. Victim A was going to report Lazzaro to the police unless he paid her the money she had earned that had gone instead to Castro Medina. An agreement could not be reached, and Victim A ended up reporting the crime to the police. The next day, Victim A's father received a Non-Disclosure Agreement (NDA) from one of Lazzaro's attorneys. The NDA stated that Lazzaro would pay $1000 to Victim A if she would agree not to disparage Lazzaro. The NDA further provided Victim A's agreement that she had engaged in a "consensual interaction" with Lazzaro. Victim A declined to sign the NDA.

### Victim B and T.L.

In the spring of 2020, Victim B and her older sister T.L. were recruited to have sex with Lazzaro in exchange for money by a male friend (a minor at the time) who was also associated with Castro Medina. Tr. Vol. II at 344, 371. Castro Medina had been tutoring this male friend, who was a high school student, and paid him money to recruit high-school girls looking for a sugar daddy. *Id.* at 348–49; Gov. Ex. G-22. The male friend reached out to 18-year-old T.L. and asked if she would like to make money from a sugar daddy. Tr. Vol. III at 605–06. T.L. understood that being a "sugar baby" would involve sexual acts for money, and said yes because she was not working at the time. *Id.* at 606.

T.L. then communicated with Lazzaro on Snapchat. Lazzaro invited T.L. to his condo for the first time in June 2020, Gov. Ex. B-5, and she went with her younger sister, Victim B, and a friend. Thinking that they would make more money if Lazzaro believed they were all adults, Victim B initially lied about her age, saying she was 18 years old. Tr. Vol. III at 615, 682. Later on that night, though, Victim B told Lazzaro her true age: 16

6

years old.  *Id.* at 683.  Once he knew how young Victim B was, Lazzaro began "coming on" to Victim B more than T.L.  *Id.*  On that first visit, after consuming a substantial amount of hard alcohol, T.L. had sex with Lazzaro and was paid several hundred dollars.

Victim B and T.L. returned to Lazzaro's condo.  In addition to cash, Lazzaro ordered the sisters hundreds of dollars' worth of cosmetics and perfume from Sephora, which would be available for them at his condo when they returned the next time.  *Id.* at 704; Gov. Ex. B-12, B-13.

On another trip to Lazzaro's condo, another friend accompanied T.L. and Victim B. The girls wore lingerie underneath their clothes, and Lazzaro offered them $100 per item of clothing that the girls would remove.  Tr. Vol. III at 686–87.  Lazzaro filmed the girls dancing in their lingerie, and a bill can clearly be seen sticking out of one of the girl's underwear.  Gov. Ex. N-24.  Lazzaro then escorted all three girls to his bedroom where he lined them up facedown on the bed and took a picture of the barely-clothed girls.  Tr. Vol. III at 690, 692–93; Gov. Ex. N-23, N-27.  Lazzaro distributed this photograph to other people, including Castro Medina, who described the girls who "were like lined up like sardines."  Tr. Vol. II at 349.

Victim B described for the jury how Lazzaro then proceeded to "fuck my sister, and then after that, he'd fuck me, and then he would fuck [their friend].  Just kind of one by one."  Tr. Vol. III at 693.  But as Lazzaro was beginning to have sex with the friend, she "got kind of uncomfortable, didn't like what was going on, so she kind of got up right away and ran out of the room really fast."  *Id.* at 694.  As she left, Lazzaro told her, "if you're not going to stay, you're not going to get paid."  *Id.* at 695, 637.  Victim B followed her

friend out of the room and then tried to get her sister to leave as well. *Id.* at 695–96. Lazzaro became upset and threw Victim B out of the condo. *Id.* T.L. stayed and had sex with Lazzaro. *Id.* Lazzaro paid T.L. and Victim B—who had sex with him—but did not pay their friend. *Id.* at 636–37.

### Victim C

In the spring of 2020, Castro Medina reached out to Victim C on Snapchat, and then met with her in person. Tr. Vol. I at 155. Victim C bonded with Castro Medina over Victim C's recent break up with her boyfriend. *Id.* at 160–64. Castro Medina told Victim C that Lazzaro thought Victim C was cute, that he was rich, and that he paid girls to come to his house to "drink and have fun." *Id.* at 166–67. Castro Medina put Lazzaro and Victim C in direct contact on Snapchat. *Id.* at 171. Victim C was 15 years old at the time and her Snapchat profile username included her birth year—2005. *Id.* at 155, 235.

Chatting with Lazzaro over Snapchat, Lazzaro arranged for Victim C and several of her friends, ages 14 and 15 years old, to travel to Lazzaro's condo to meet him. *Id.* at 171. On August 9, 2020, Victim C was at a friend's house having a slumber party with three other girls. *Id.* Lazzaro sent a car to pick up Victim C and two of the other girls to bring them to the Hotel Ivy. *Id.* at 172; Gov. Ex. N-20. Victim C and her friends "were so fascinated" and "a little bit in awe" at the opulence on display in Lazzaro's residence. Tr. Vol. I at 179. Victim C recalls merely talking with Lazzaro that night. *Id.* at 189, 193. But her friend M.E. remembers a far more disturbing and heartbreaking series of events.

Victim C testified that she thought she drank only champagne that night. *Id.* at 197. But M.E. said that the girls all drank a liquor that "was like clear and it had gold flakes in

it." Tr. Vol. III at 560.  As this Court recalls, photographs capturing Lazzaro's bar area depict a bottle of Goldschläger on the second shelf from the top.  Gov. Ex. J-8. According to the company's website, Goldschläger is a an "87-proof cinnamon shot made with real gold flakes."  https://goldschlager.com/ (last visited July 23, 2023).  M.E. recalls that Victim C left the living room with Lazzaro at one point in time.  Tr. Vol. III at 561.  Later, Victim C stumbled out of Lazzaro's bedroom and faceplanted on the living room floor with her pants and underwear around her ankles.  *Id.* at 561–62.  M.E. and another friend had to help Victim C off the floor.  *Id.* at 562.  Lazzaro paid the three girls that came $100 each. He gave them an additional $200 for their friends who did not come and suggested that they should return.  He then arranged for an Uber to take them back to the slumber party so they wouldn't be missed.

Digital data collected in this case shows that Victim C went to Lazzaro's condo on multiple occasions, sometimes with friends and sometimes on her own.  *See* Gov. Ex. N-28 (showing 15-year-old C.B. in Lazzaro's bedroom with Victim C on August 11, 2020); Gov. Ex. C-20 (showing Victim C in Lazzaro's bathroom saying that she is too drunk to stand on August 19, 2020).

Victim C provided detailed testimony about two other incidents with Lazzaro.  On August 18 and into August 19, 2020, Victim C and C.B. went to Lazzaro's condo together after Lazzaro ordered a car to drive them from a friend's house in the area near St. Michael. Tr. Vol. I at 204.  Lazzaro served the 15-year-olds shots of Everclear.  *Id.* at 205.  The girls quickly became more inebriated than they expected and had difficulty standing.  *Id.* at 206; Gov. Ex. C-20.  Lazzaro seized on this opportunity to suggest that Victim C "lay down in

his room," and he accompanied her there.  Tr. Vol. I at 206.  Lazzaro began a sexually-focused game of truth or dare with the 15-year-olds.  *Id.* at 207.  Lazzaro dared the girls to let him send a Snapchat of the two of them in his bed to a friend.  *Id.* at 208; Gov. Ex. N-28.

Lazzaro dared and then, as he had with Victim A and Castro Medina, paid the friends to kiss each other.  Tr. Vol. I at 207.  C.B. became uncomfortable and left the room. Victim C remained on the bed.  In light of how much hard alcohol she drank, she was unable to control her body.  While she was in this state of near-paralysis, Lazzaro rolled Victim C onto her back so that he could have sex with her.  *Id.* at 210.  Victim C told the jury, "I wanted to get up or do something about it, but I couldn't really do anything about it, even though I wanted to get up or stop it or something."  *Id*.  After he had sex with this 15-year-old girl who could not move, Lazzaro gave Victim C cash payment for the sex and some food from McDonald's and emergency contraception for the ride home.  *Id.* at 211.

After this experience, Lazzaro wanted C.B. to return to the condo alone, but Victim C was understandably worried about what Lazzaro might do to her friend, so she volunteered to go instead.  *Id.* at 214.  Lazzaro picked up Victim C from a park near C.B.'s house in his Ferrari.  *Id.* at 214–15.  Victim C recalled drinking Everclear again and becoming drunk enough that she "couldn't really function."  *Id.* at 216.  Lazzaro again had sex with Victim C and drove her home with more cash and emergency contraception.  *Id.* at 217.  Victim C told the jury, "Looking back, I wish I never met Gisela. I wish none of it happened. I wish—I wish it never happened." *Id.* at 222.

10

**Victims D & E**

Late in the summer of 2020, 16-year-old Victim E received a Snapchat message from Castro Medina, saying that Castro Medina's "sugar daddy" thought Victim E was cute. Tr. Vol. IV at 904. Castro Medina told Victim E that Lazzaro was not "creepy" and sent Victim E pictures of money and alcohol that Lazzaro had given to her. *Id.* at 905. Soon Victim E was connected with Lazzaro on Snapchat and the topic of money came up fairly quickly in their communication. *Id.* at 909. Victim E agreed to meet with Lazzaro at the Mall of America. There, Lazzaro purchased Victim E an expensive Prada purse and invited her to come back to his place. *Id.* at 916. Victim E declined that time but returned at a later date with her friend Victim D. Victim E understood that if she returned, she would likely get more stuff but she would probably have to engage in sex to get money. *Id.* at 931.

Approximately a month after Victim E declined Lazzaro's invitation to his condo, her friend and classmate, 16-year-old Victim D, suggested that the girls consider reaching out to Lazzaro. *Id.* at 922. Victim D contacted Lazzaro and both girls were invited to the Hotel Ivy. *Id.* at 992. Like Victim E, Victim D believed they would get money, but only if they had sex with Lazzaro:

Q.    Why did you go to Tony's place?

A.    I didn't want a Prada purse, but I wanted something, like something similar to a Prada purse I guess at the time.

Q.    Did you think that you might have to have sex?

A.    Yes.

11

Q.    Did you want to have sex?

A.    No.

Q.    What did you want?

A.    Gifts.

*Id.* at 992.

A friend drove the girls to the Hotel Ivy. *Id.* The girls asked for Tony in 1920 and the desk clerk granted them access to Lazzaro's condominium. *Id.* at 994. Upon meeting Lazzaro, Victim D believed him to be "[w]ealthy" and "powerful." *Id.* at 995. Lazzaro offered the girls alcohol, but they declined. *Id.* at 996. The girls told Lazzaro that they were juniors in high school and only 16 years old. *Id.* at 997, 998. Once again, Lazzaro asked the two girls to kiss one another, but they declined "because [they] were best friends." *Id.* at 998. Both girls performed oral sex on Lazzaro, and then Lazzaro had vaginal sex with Victim D. *Id.* at 937, 999. While having sex with them, Lazzaro repeatedly referred to them as "good girls." *Id.* at 938. Afterwards, Lazzaro gave hundreds of dollars in cash to Victim E and gave Victim D hundreds of dollars in cash and a brand-new iPhone. *Id.* at 938, 1000. Lazzaro also gave both girls handfuls of flavored Puff Bar disposable vaping pens on their way out the door. *Id.*

At the end of September, Victim E returned to the Hotel Ivy on her own. *Id.* at 942, 944. Victim E explained to the jury that "it was collectively known that, like what I was there for . . . [a]nd so we moved pretty quick to his room where I had sex with him." *Id.* at 942. Victim E received more cash for having sex with Lazzaro. *Id.*

In October 2020, Victim D also returned to the Hotel Ivy alone and had sex with Lazzaro. *Id.* at 1007. Victim D told the jury that, on this occasion, Lazzaro had gotten new bedding and asked Victim D to make the bed for him. *Id.* at 1009. Victim D explained, "I felt like I was playing a role or something. I felt kind of like I was in a porno." *Id.* 1010. While Victim D was bent over making the bed, Lazzaro "began to touch [her] and then have sex with [her]." *Id.* When it was over, Lazzaro paid her cash. *Id.* Victim D noted however, that "after Tony" she "was a completely different person." *Id.* at 1013.

Victim D's mother, Sally, became suspicious, noticing expensive purchases that Victim D made and changes in her grades and attitude. *Id.* at 975–76. Sally described these changes to the jury: "So in addition to her grades falling, she started to like isolate herself. And she was such a social person and her friends were so important to her, but she just started to spend a lot of time in her room," *id.* at 982, where Victim D was drinking alcohol to numb the pain, PSR ¶ 44, p.13. Through some sleuthing, and with the help of an anti-trafficking organization, Source Minnesota, Sally learned what was going on. As she told the jury, "I was horrified. I don't even have words to describe how—I had all kinds of emotions. I couldn't believe that someone would do that to my daughter and lure her in that way." Tr. Vol. IV at 981.

Sally eventually called the FBI and a joint investigation with the Minnesota Bureau of Criminal Apprehension started in late October.

## II. OTHER RELEVANT CONDUCT

In addition to sex trafficking the five named victims in this case, Lazzaro engaged in other behavior relevant to sentencing.

First, although Castro Medina was an adult at the time she met Lazzaro, his conduct towards her warrants punishment.  Castro Medina testified that the second time she and Victim A visited Lazzaro's condo, she became so drunk that she was drifting in and out of consciousness.  Tr. Vol. II at 309.  She remembers being curled up on the edge of the bed in a fetal position when Lazzaro "called [her] into the mix" to have sex with her.  *Id.* at 308.  Victim A recalls that Castro Medina was "completely unconscious" and "had no idea what was going on."  Tr. Vol. IV at 801.  Victim A tried to stop Lazzaro from having sex with Castro Medina, telling Lazzaro that he could not have sex with someone who was unconscious.  *Id.*  This Court should consider this conduct, which mirrored Lazzaro's later conduct with Victim C—in fashioning a fair and just sentence for Lazzaro.

Second, Lazzaro attempted to obstruct the investigation and prosecution at many points in this case.  The Court is familiar with the non-disclosure agreement that Lazzaro asked Victim A and her father to sign, which attempted to prevent them from telling anyone—including the police—that Lazzaro and Castro Medina had trafficked Victim A. Tr. Vol. IV at 814; PSR ¶ 45.  Lazzaro twice attempted to dissuade Victim C from speaking with the Government.  In October 2020 Lazzaro went, and on March 2021, Lazzaro sent Castro Medina to Victim C with money and alcohol and instructed Castro Medina to tell Victim C that Lazzaro had "very good lawyers."  *See* PSR ¶ 45; ECF No. 76 at 8.  Lazzaro hired people to surveil the victims, both before and after receiving target letters from the Government, in an effort to deduce the strength of the case and intimidate the victims.[1]  For

---

[1] As the Court recognized in an early order in this case (ECF No. 76 at 9), Defendant's surveillance and attempts at intimidation extended to members of the

example, a woman showed up at Victim E's workplace and asked to speak with her about Lazzaro, causing her to continue to have anxiety when she goes to work.  PSR ¶ 44, p.16.

Lazzaro also attempted to obstruct the administration of justice as to the greater conspiracy based on his continued payments of money and items to Castro Medina following the execution of federal search warrants and receipt of a target letter in December 2020 and a meeting of his large legal team with the AUSAs on the case at the U.S. Attorney's Office in August 2021 that in his estimation went poorly—just days before the case was presented to the grand jury.

Finally, as discussed in the following section, Lazzaro committed perjury when he testified at trial.

## SENTENCING GUIDELINES CALCULATION

### I.   GUIDELINES CALCULATION

The district court should begin sentencing proceedings by correctly calculating the applicable sentencing guidelines range.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The United States agrees with the calculation as presented in the Presentence Report.

The appropriate base offense level is 43.  PSR ¶ 96.  The appropriate criminal history category is I.  PSR ¶ 101.  Lazzaro went to trial and has not shown any acceptance of responsibility for his crimes. Lazzaro also obstructed justice. While not assessed in the PSR

---

prosecution team.  At the time of his arrest, Lazzaro made comments indicating that he had collected "home addresses and other personal information about the law-enforcement officers involved in his case."  ECF No. 76 at 8.  Lazzaro has also made threatening remarks towards one of the prosecutors since the inception of this case, including threats in jail calls that were reported to the U.S. Marshals Service.  Through supporters, Lazzaro also set up a website shortly before trial that published the name of the prosecutor's spouse.

as another basis for an obstruction enhancement, this Court can also consider Lazzaro's untruthful trial testimony where he lied under oath about Castro Medina's role as a recruiter in their conspiracy, lied about paying Castro Medina to recruit girls for him, lied about paying someone to recruit his now girlfriend, lied about making himself appear closer in age to his victims, and most critically, lied about the cash and other items of value that he gave the girls in exchange for sex. Lazzaro is not generous. He is a sex trafficker. The jury had no difficulty reaching this verdict.

Lazzaro's total offense level of 43 and criminal history category I results in an advisory sentencing guidelines range of imprisonment for life.  PSR ¶ 136.  On Count 1, conspiracy to commit sex trafficking of minors, there is no minimum term of imprisonment up to life imprisonment.  PSR F.1.  On each of Counts 2 through 6, sex trafficking of minor victims A through E, the minimum term of imprisonment is 120 months up to life imprisonment.  PSR F.2.

The base offense level for sex trafficking a minor is 30. PSR ¶¶ 50, 58, 66, 74, 82. Several specific offense characteristics were found to apply to all victims.

First, Lazzaro unduly influenced the minors to engage in sexual conduct, so the base offense level is increased by 2. PSR ¶¶ 51, 59, 67, 75, 83. There is a rebuttable presumption that this enhancement applies because Lazzaro was 30 years old when he trafficked 15- and 16-year-old girls; he was more than 10 years older. Lazzaro repeatedly lied about his age—to appear to be in his early 20s. Moreover, trial testimony is replete with references to Lazzaro plying the victims with alcohol—often to the point where they could not control their bodies let alone engage in any informed decision-making.

16

Second, Lazzaro and Castro Medina used a computer or interactive service to entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with a minor, so the base offense level is increased by another 2 levels. PSR ¶¶ 52, 60, 68, 76, 84. Lazzaro met victim Victim A and Castro Medina through the "sugar daddy" website, Seeking Arrangement. As the recruiter, Castro Medina used Snapchat to send photos of Lazzaro and recruiting messages to girls. In addition, Apps such as Uber, Lyft, Venmo, and others were used to facilitate the sex trafficking.

Third, the offense involved the commission of a sex act or sexual conduct, so the base offense level is increased by another 2 levels. PSR ¶¶ 53, 61, 69, 77, 85. This enhancement is not in dispute. Lazzaro acknowledges that he had sex with Victim A, Victim B, Victim C, Victim D, and Victim E. Each victim testified that she engaged in sex for money with Lazzaro on more than one occasion. These commercial sex acts were corroborated by phone records and ride-share records.

An adjustment for obstruction of justice was found to apply to Victim A and Victim C. PSR ¶¶ 56, 72. The PSR applied the Chapter Three adjustment for three separate reasons. First, when Victim A went to report the sex trafficking to law enforcement, Lazzaro went to his attorney's office to have a Non-Disclosure Agreement written-up, so Victim A would not disparage him and would state that their sexual activity had been consensual. If Victim A and her father signed the contract, she would have been paid $1000. Second, Lazzaro drove to Victim C's workplace, sidled up to her at a booth, slid money to her in an envelope, and secured a surreptitious recording of her stating an age other than the 15-years that she

17

was. On Lazzaro's behalf, Castro Medina followed up by providing alcohol, money, and vapes to Victim C in an effort to buy her silence.

In arriving at the advisory guidelines range, the greatest adjusted offense level is used, which is 38. PSR ¶ 91. Because there were five separate victims, the total number of units is 5. PSR ¶ 90. This results in an increase to the offense level of 4, resulting in a combined adjusted offense level of 42. PSR ¶ 93.

Finally, a Chapter Four enhancement applies because Lazzaro is a repeat and dangerous sex offender for engaging in a pattern of activity involving prohibited sexual conduct. PSR ¶ 94. A pattern of activity under U.S.S.G. § 4B1.5, comment. (n.4(B)) is defined as prohibited sexual conduct with a minor on at least two separate occasions. An occasion may be considered without regard to whether it occurred during the course of the instant offense or resulted in a conviction. Here, Lazzaro engaged in sex trafficking of a minor with each of the five victims. Because trafficking of each victim—Victim A, Victim B, Victim C, Victim D, and Victim E—qualifies as at least one occasion of prohibited sexual conduct, the five-level enhancement applies.

All combined, this results in an off-the-charts total offense level of 47. This is reduced to the maximum allowed under the guidelines, 43. With a criminal history category I, the advisory guidelines range is life.[2] PSR ¶136.

---

[2] The government recognizes that if the Court were not to apply or vary downward as to the Chapter Four Repeat and Dangerous Sex Offender Against Minors enhancement based on reasons as outlined in the PSR at paragraph 155, this would result in a total adjusted offense level of 42 and an advisory sentencing guidelines range of 360 months to life, which is identified by U.S. Probation and Pretrial Services as a more appropriate starting point to further consider the goals of sentencing.

18

II.     LAZZARO'S OBJECTIONS TO THE GUIDELINES CALCULATION

**Obstruction & Perjury**

Lazzaro objects to application of a two-level Chapter Three adjustment for obstruction of justice. He claims that he did not attempt to influence any reports to law enforcement. As to Victim A, Lazzaro argues that the NDA was not a secret document and did not attempt to influence testimony; it was meant to prevent disparagement. As to Victim C, Lazzaro claims he could not obstruct justice because whether Victim C was 15, 16, or 17, she was a "minor" under the federal sex trafficking statutes. PSR A.3.

The obstruction adjustment applies. Tellingly, while Lazzaro attempts to make a broad-brush legal argument, he does not dispute the underlying facts leading to the application of the adjustment. Lazzaro does not object to the fact that Castro Medina met with Victim C and gave her cash, alcohol, and vapes and asked her not to answer any questions from law enforcement about Lazzaro. In addition, Lazzaro does not dispute the many items he gave Castro Medina—including a Mini Cooper, Apple iPhone and MacBook, and money to travel and to buy margaritas—after a search warrant was executed and a target letter was served. Castro Medina also testified that Lazzaro promised her money for graduate school and a house if she did not cooperate in the sex trafficking investigation. Tr. Vol. II at 397–98.  These efforts, while ultimately unsuccessful, broadly relate to an attempt to influence Castro Medina's conduct and testimony.

While not assessed in the PSR, Lazzaro's obstructive conduct during trial should be considered in applying the obstruction adjustment and in arriving at a fair sentence. This

includes perjury, U.S.S.G. § 3C1.1 application n.4(B) and 4(F) and contact with sequestered witnesses, *id.* n.4(I) including Kira Coastal.

As to perjury, there are many examples of material falsehoods testified to by Lazzaro and relevant to this two-level adjustment.

First, Lazzaro denied that Castro Medina played the role of recruiter in their conspiracy. At trial, Lazzaro stated: "But there was never ever an agreement to become my recruiter. That term was never used." Tr. Vol. V at 1275. Lazzaro again denied this on cross-examination. Tr. Vol. VI at 1409, 1446–48. Castro Medina testified that was her role. In addition, multiple government exhibits identified Castro Medina's role as the recruiter. Charles Bittman's communication with Lazzaro noted: "See why I use gisela / recruiters / sa?" Gov. Ex. N-22. Lazzaro also told Castro Medina in their WhatApp text: "No paycheck until Ann is mine." Gov. Ex. G-15. And Lazzaro told another friend that he meets girls through Castro Medina who is "quite shall we say influential." Gov. Ex. H-7. As proven at trial, Castro Medina was a recruiter in the sex-trafficking conspiracy.

Second, and related, Lazzaro testified falsely that he did not pay Castro Medina to recruit girls for him. Tr. Vol. VI at 1410. Castro Medina testified that she worked to recruit victim Victim E when she was in a bad situation in Colorado with her then boyfriend Ben. Castro Medina herself understood that she was being used to arrange commercial sex acts for Lazzaro. As to victim Victim A, Castro Medina texted a friend asking if she was a "pimp" because Lazzaro sent an envelope of money for her with Victim A when she was not there. Gov. Ex. G-10.   In addition, Castro Medina sent a message to Lazzaro stating

that she was going to ask what her payment would be for introducing Lazzaro to a minor, Paige, "but then I realized I j[ust] got my tuition paid." Gov. Ex. N-15.

Third, Lazzaro denied having paid Castro Medina's boyfriend Ben Soberg for recruiting Kira Coastal for him: "I definitely didn't pay him for like introducing me to Kira." Tr. Vol. V at 1323. In text communication, Lazzaro reminded Soberg that Lazzaro had paid Soberg "another $1000 when u intro'd me to kira." Gov. Ex. G-14 at 14.

Fourth, Lazzaro also lied about his age to the minors. At trial, however, he claimed he never had. Tr. Vol. VI at 1491. Victim C's friend, M.E., testified that Lazzaro told her that he was in his early 20s. Tr. Vol. III at 595. Victim A had understood Lazzaro to be in his 20s. Tr. Vol. IV at 839. Victim B testified that Lazzaro told her he was "around" 22 or 23 years old. Tr. Vol. III at 684. And Victim E testified that Lazzaro told her that he was 25 years old. Tr. Vol. IV at 935.

Finally, at the heart of the case, Lazzaro testified that he did not pay the minors for sex. *See* Tr. Vol. VI at 1409, 1417, 1419 –20, 1439-40 (Victim A); Tr. Vol. VI at 1462 (Victim B); Tr. Vol. V at 1293, 1301, 1304, and Tr. Vol. VI at 1493 (Victim C); and Tr. Vol. V at 1321 (Victim B). The jury's verdict indicates that Lazzaro's testimony was false. In addition, trial testimony is replete with references to the minors receiving money and items of value when they were caused to engage in sex with Lazzaro. Lazzaro sent Victim A and Castro Medina a photo of himself posing with cash stating: "I don't fuck around." Gov. Ex. A-6. Castro Medina posed with cash after their first visit to Lazzaro's condo. Gov. Ex. G-7. Victim A and Castro Medina also discussed the fact that they did not get more money from Lazzaro the first time they were at his condo because they did not make

out with each other as requested. Tr. Vol. II at 319; Gov. Ex. A-8.  When they did during the next visit, Lazzaro excitedly exclaimed: "There we go!" Gov. Ex. A-12. Victim B testified that Lazzaro told her and Ella that they would not get paid if they did not perform. Tr. Vol. III at 695. Victim C testified that she received more money when she had sex with Lazzaro. Tr. Vol. I at 212. Victim E testified that she received money in exchange for sex with Lazzaro. Tr. Vol. IV at 939–40. Victim E texted Victim D that she got "shmoney" after having sex with Lazzaro. Gov. Ex. D-12. Finally, Victim D testified that she had sex with Lazzaro only to receive cash. Tr. Vol. IV at 1010.

Moreover, Lazzaro attempted to comport his testimony with the voluminous discovery produced to serve his theory of the case. As an example, as to Victim E, Lazzaro testified remembering "we were going to cook because she's like a culinary student or student, and that didn't happen." Tr. Vol. V at 1319. In reality, Victim E was at the start of her junior year in high school and did not become a culinary student until she left high school months later.  Tr. Vol. IV at 903 (Victim E testifying that she was not working at the time she met Lazzaro).

The government bears the burden of proving the facts necessary to support a finding of obstruction of justice for imposition of a sentencing adjustment by a preponderance of the evidence. *United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2004). A finding of perjury is sufficient to support a Chapter Three adjustment. While it is insufficient to find that a defendant committed perjury "simply because a defendant testifies on his own behalf and the jury disbelieves him," *id.*, the district court, instead, must find that the defendant gave "false testimony concerning a material matter with the willful intent to provide false

testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Thundershield*, 474 F.3d 503, 507 (8th Cir. 2007) (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

Lazzaro's statements were material. Specifically, statements that he did not ask and did not pay Castro Medina to recruit girls for him. This was directly contradicted by Castro Medina's testimony, the numerous Snapchat exhibits introduced at trial, the girls' testimony that but-for Castro Medina, they never would have met Lazzaro, and Lazzaro's own text to his friend and business partner Charles Bittman that he used "Gisela" to recruit for him. At the heart of the sex trafficking is that Lazzaro caused the girls to engage in commercial sex acts with him based on the items of value he provided. Lazzaro claims that there was no connection between the items of value given—cash, vapes, high-end makeup, purses, and cell phones—and the sex the girls engaged in with him. Each victim testified otherwise. As this Court observed, Lazzaro's multi-day testimony was not the result of confusion, mistake, or faulty memory. Under *Thundershield*, the obstruction adjustment under U.S.S.G. § 3C1.1 applies.

### Undue Influence and Use of a Computer Enhancements

Lazzaro contends that the two-level enhancements do not apply because they require a minor to be engaged in "prohibited sexual conduct." Lazzaro claims that the sexual conduct he engaged in with the girls was not otherwise unlawful. Lazzaro also claims that victims Victim D and Victim E declined to drink the alcohol he offered and were otherwise in charge of their efforts to extract as much money from Lazzaro as possible, so he could not have unduly influenced them. PSR A.3.

The enhancements apply. Prohibited sexual conduct is defined as "any sexual activity for which a person can be charged with a criminal offense" pursuant to U.S.S.G. § 2G1.3, comment. (n.1.), U.S.S.G. § 2A3.1, comment. (n.1.). Here, that definition applies. Lazzaro was convicted of sex trafficking five minors based on engaging in commercial sexual activity. That is prohibited sexual conduct. As to Victim D and Victim E, even if they refrained from drinking alcohol, they were both more than 10 years younger than Lazzaro. At trial, the victims testified that Lazzaro told them he was younger than he was. M.E., Victim A, Victim B, and Victim E testified that Lazzaro told them he was in his 20s. Lazzaro's age, and his lies about his age, along with the alcohol and vapes he provided, make the undue influence enhancement appropriate. Moreover, as seen at trial, a significant power imbalance was at play between Lazzaro and his young victims given Lazzaro's perceived wealth and connections.

The Eighth Circuit has held that the key question is "whether a participant's influence over the minor compromised the voluntariness of the minor's behavior." *United States v. Carter*, 960 F.3d 1007, 1011 (8th Cir. 2020). In one case, a defendant, well more than 10 years older than his victims, often exchanged drugs for sex with cash-strapped and drug-addicted minors. On that record, the Eighth Circuit found the defendant came nowhere close to rebutting the presumption of undue influence. *United States v. Streb*, 36 F.4th 782, 790–91 (8th Cir. 2002). Here, Lazzaro—close to twice the age of his victims— exchanged alcohol and lots of cash for sex with girls who Castro Medina identified to be "broken girls."

24

This enhancement applies here just as it has been found to apply in similar circumstances by other courts. *See, e.g.*, *United States v. Watkins*, 667 F.3d 254, 265–66 (2d Cir. 2012) (affirming two-level enhancement despite defendant's claim that a presumption of undue influence was rebutted by evidence of the victim's "eagerness" as a participant in the offense when the defendant was 33 years older than the victim, he conceded that he misrepresented his age as part of his initial seduction of the victim, and there was evidence of numerous instances of "manipulative behavior" by defendant); *United States v. Lay*, 583 F.3d 436, 445–46 (6th Cir. 2009) (affirming two-level enhancement for undue influence of a minor, even if minor victim initiated the original communication with defendant and proposed a meeting, where defendant, in pursuit of a sexual liaison, continued to ply vulnerable and troubled fifteen-year-old with gifts and attention); *United States v. Miller*, 601 F.3d 734, 738 (7th Cir. 2010) (affirming two-level enhancement for unduly influencing a minor, where the court acknowledged that the presumption of undue influence which arose out of the difference of at least ten years of age between defendant and her victim was rebuttable, and concluded, based on the evidence presented, that defendant had failed to rebut).

Similarly, the plain language of the guidelines directs the application of the two-level computer-use enhancement. Here, there was evidence of use of Seeking Arrangement, text communication with Victim A, Snapchat communication with victims Victim C and Victim E, WhatsApp communication with co-defendant Castro Medina, and other applications such as Venmo, UberEats, and ride-sharing apps. The Eighth Circuit has held the enhancement applies when any computer is used—whether a cell phone used only

to make voice calls and send text messages even if the phone could not access the Internet, *United States v. Kramer*, 631 F.3d 900, 902–03 (8th Cir. 2011) or to post advertisements on websites, *United States v. Gibson*, 840 F.3d 512, 514–15 (8th Cir. 2016). The computer-use enhancement clearly applies here.

### Repeat and Dangerous Sex Offender Against Minors

Lazzaro claims that the five-level Chapter Four enhancement does not apply. Principally, he argues that he has no criminal history and, in fact, attempted to conform his conduct to the law by pursuing sexual relations only with girls who were at least 16 years old. Lazzaro claims he does not represent a continuing danger to the public.

Factually, while most of the victims identified in the investigation were 16 years of age or older, Lazzaro's contention that he was looking for persons at least 16 years of age is not consistent with the record. Lazzaro was happy to engage in commercial sex acts with younger girls. The slumber party girls were young. M.E. and B.M. were 14, and Victim C and C.B. were 15. Victim C testified that she was just finishing the tenth grade after she met and engaged in commercial sex acts with Lazzaro. Tr. Vol. I at 151.

Fitting within the enhancement's plain text, Lazzaro was convicted of engaging in commercial sex acts with at least five girls under the age of 18—Victim A, Victim B, Victim C, Victim D, and Victim E. This constitutes a pattern. And each girl testified that Lazzaro had sex with them more than once. The plain meaning of "separate occasions" requires only events that are independent and distinguishable from each other. The Chapter Four pattern strictly applies. *See United States v. West*, 2022 WL 321136 (8th Cir. 2022) (citing *United States v. Pappas*, 715 F.3d 225, 229 (8th Cir. 2013) (counting each instance

of prohibited sexual activity with the same minor)). The Tenth Circuit applied the pattern despite defendant's contention that he engaged in only one prohibited sexual act with each of two minors because the enhancement could be applied to either repeated abuse of a single minor or to separate abuses of multiple minors. *See United States v. Cifuentes-Lopez*, 40 F.4th 1215, 1219–20 (10th Cir. 2022). Indeed, the Tenth Circuit explained that the multiple count enhancement in U.S.S.G. § 3D1.4 is to "provide incremental punishment for significant additional criminal conduct" whereas the § 4B1.5(b)(1) pattern is to protect minors from sex offenders who present a "continuing danger to the public." *Cifuentes-Lopez*, 40 F.4th at 1221 (noting that the Chapter Four pattern enhancement is derived from a Congressional directive "to ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual exploitation of minors"). As to Lazzaro, the application of the Chapter Four enhancement is not a close call.

All told, the sentencing guidelines are correctly calculated and result in an advisory sentencing guidelines range of life.

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

But crafting a fair and just sentence here includes more than simply a mathematical calculation of the sentencing range. In addition to determining Lazzaro's advisory sentencing guidelines range, 18 U.S.C. § 3553(a)(4), this Court is required to assess the other applicable sentencing factors under § 3553(a). Those factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal

conduct, and to protect the public from further crimes of the defendant; to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

In this case, considering all the sentencing factors, the government respectfully submits that a sentence of 360 months—a sentence below the advisory guidelines range—is appropriate for Anton Joseph Lazzaro. Such a sentence would be sufficient but not greater than necessary to accomplish federal sentencing goals in this case.

First, Lazzaro committed a serious offense that is deserving of appropriately serious punishment.  The instant offense involved preying upon the vulnerabilities of teenage girls for Lazzaro's benefit—his own sexual gratification. Lazzaro skillfully took advantage of their youth and naiveté. Lazzaro cautioned that he had to be careful—some of the young girls appeared to be too good and might expose him to law enforcement or their parents. But "broken girls" would not. Lazzaro showed no regard for the victims— referring to the seduction of Victim C and her 14- and 15-year-old friends as the "art of the tart." Gov't Ex. N-20.  Lazzaro lined up Victim B, T.L., and their friend on his bed like sardines and took "trophy" shots that he sent to his co-defendant Castro Medina and his friend Charles Bittman.

The victims' testimony at trial and their written impact statements say it best. Lazzaro's conduct is deserving of a very, very long sentence. Victim A stated: "Everything with the trafficking changed me. It changed everything. I don't trust anyone anymore. I don't know if I ever will." PSR ¶ 43 p. 10. Victim A feels the impact of what Lazzaro did

daily. "I now have borderline personality disorder and extreme PTSD that I struggle with every single day. I've tried to commit suicide so many times I have lost count." *Id.*

Victim D described that her "innocence was stolen from me the second [Tony] opened his apartment door." *Id.* at 13. Victim D became a completely different person. *Id.* at 14. She went through various stages of trauma. Her grades slipped, going from an honor roll student to failing. "I could no longer concentrate on school. I was in too much pain." *Id.* Victim D then started locking herself in her bedroom every night "to drink into an oblivion. It was the only way I thought at the time to numb myself from what he did to me." *Id.* Victim D began to take multiple showers each day because she never felt clean. *Id.* "I stopped eating. I became so depressed I never want to leave my house. I stopped trusting people. I let myself go. [Tony,] you made me feel worthless. You had already bought me. I was worth $600 and an iPhone, nothing more. Then you discarded me and moved on to the next little girl." *Id*. Victim D still fears Lazzaro. "What he did was selfish. He took my innocence from me and gave me cash in return." *Id.*

Victim E is not able to have successful relationships with others and feels sexualized all the time. PSR ¶ 43, at 15. Victim E did not graduate. Typical high school moments were instead replaced by FBI meetings, isolation, and hiding. *Id.* at 16. Victim E wants Lazzaro to know that treating kids like that impacts them for the rest of their lives. Money does not give Lazzaro power and allow him not to follow the rules like everyone else. "I want [Lazzaro] to know that 'broken girls' are not broken but just kids trying to figure things out." *Id.*

Not only does the crime impact the girls, but their whole families. Victim A's mother describes how difficult it is to address the Court "because saying how broken we are as individuals and a family is heartbreaking for me." *Id.* at 12. Dealing with Victim A's nightmares, desire to kill herself, self-medication, and physical harm has caused anxiety and PTSD in Victim A's mother who has watched Victim A go from a once vibrant, smiling, happy, funny, and beautiful daughter to physically insecure, anxious, with PTSD, and little trust in people. In her words, it is "heart wrenching." *Id.* Victim A did not deserve what Castro Medina and Lazzaro did to her: "She doesn't deserve to live in hell in her own head!!!!!! IT'S NOT FAIR!!!" *Id.* at 13.

As Victim D's mom powerfully testified, the trafficking changed everything. Victim D "became a shadow of what she used to be in just a few months." *Id* at 15. Victim D hit rock bottom almost a year after meeting Lazzaro and then started on the road to recovery with intensive therapy, a treatment center, halfway house, and more. *Id.* Victim D is now 18 months sober and "I'm beginning to see glimpses of the girl she used to be. She still struggles with anxiety and finds it difficult to trust men. I know she lost a part of herself when [Lazzaro] decided to prey on her. I do see her moving forward, and she has started to have goals for her future again." *Id.*

 Second, as to the history and characteristics of the offender, Lazzaro stands in stark contrast to his victims. By all accounts, he grew up in relative wealth and privilege. Lazzaro graduated from high school and attended college, dropping out because he could make more money behind a computer. Lazzaro followed a woman he met on Seeking Arrangement to South Dakota and eventually settled in Minnesota where his wealth

allowed him to rub elbows with prominent politicians, athletes, and musicians. While he has no criminal history, his history and characteristics do not support a sentence lower than 360 months.

Third, the sentence imposed must reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct. The sentence must also protect the public from further crimes of the defendant. The government can think of no more serious offense than the sex trafficking of children. As this Court heard at trial, the girls were treated as objects to be bought for sex. Despite Lazzaro's attempts to characterize this as lawful, consensual behavior, it was far from it. The Eighth Circuit has had no problem calling this what it is: sex trafficking. Section 1591(a)(2)'s plain language makes clear that Congress intended to include purchasers of commercial sex who violate the statute's terms as sex traffickers. *United States v. Cook*, 782 F.3d 983, 990 (8th Cir. 2015) (citing *United States v. Jungers*, 702 F.3d 1066, 1069 (8th Cir. 2013)). Indeed, the statute applies even if there is not a real minor on the other side. *United States v. Wolff*, 796 F.3d 972, 975 (8th Cir. 2015).

As proven at trial, Lazzaro is a sex trafficker: he recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and solicited minor girls to engage in commercial sex acts—sex acts with him. As such, a serious sentence is needed to promote respect for the rule of law, provide just punishment, and deter Lazzaro and others.

As Victim D's mother articulated:

[Lazzaro] didn't demonstrate any remorse for the crimes he committed against the girls. He showed blatant disregard for them during the trial. I'm pleading with you [Chief Judge Schiltz] to impose the strictest sentence

possible, so he will understand what he did was wrong and the absolute negative impacts his actions caused. A long sentence might also deter other predators from committing the same type of crime.

PSR ¶ 43 at 15.

Fourth, this Court is to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The government has no objection to defendant's placement in a facility that would allow him the opportunity for appropriate correctional treatment. Following defendant's release from confinement, Lazzaro should remain under supervised release for at least ten years if not longer. *See* U.S.S.G. § 5D1.2(b)(2).

Fifth, a sentence of 360 months will avoid unwarranted sentencing disparities among defendants who have been found guilty of sex trafficking and related crimes. The Government offers the following comparisons to sentences that this Court imposed on defendants in cases bearing some similarities to Lazzaro's conduct and circumstances.

First, this Court sentenced sex trafficker Darnell Deshawn Stennis, 20-cr-19 (PJS/BRT) to 240 months' imprisonment and 5 years of supervised release after trial for trafficking an adult woman by force, threats of force, fraud and coercion and committing obstruction. Stennis's Guidelines range was 324–405 months' imprisonment, and the Court varied downward. As this Court recognized at Stennis's sentencing hearing, sex trafficking "encompasses a spectrum of conduct." Comparing the two cases, Stennis used more force than Lazzaro, who preferred to intoxicate his victims to the point that little force was needed. But Stennis's victims were "street-wise adult women"; they were not minors

32

still undergoing essential brain development.  Moreover, Stennis had a difficult upbringing: neither parent was fully present, both having been felons who allowed drugs in the home. Stennis grew up in poverty, experienced homelessness and mental illness, and was surrounded by gangs, guns, violence, and drugs.  Lazzaro has no such mitigating factors weighing in favor of a downward variance.

Second, this Court sentenced Kevin James Petroske, 17-cr-116 (PJS/LIB), to 240 months' imprisonment after trial for surreptitiously producing child pornography of teenage girls from outside their bedroom window. By all measures, Lazzaro deserves a substantially greater sentence than Petroske.  Petroske was a "peeping Tom."  He spied on and stalked six minor girls—ages fourteen to sixteen—who lived in Hibbing, Minnesota. He climbed ladders and hid in windows with his phone—a camera—trying to catch them in various stages of undress.  He created child pornography by videotaping them in their vulnerable moments, all while masturbating.    While Pestroske's conduct was reprehensible, Lazzaro's behavior is deserving of a more significant sentence, *by nearly every metric.*

Both men preyed on a similar number of girls, of similar ages.  But Lazzaro's conduct was "hands-on," which is to say that instead of merely violating the privacy and sense of security of his victims, as Petroske did, Lazzaro engaged with his victims physically.  Lazzaro paid at least five minor victims for sex.  While not charged federally, the Court saw clear and unrebutted evidence that Lazzaro plied his young victims with alcohol and sexually assaulted both Victim C and Castro Media—having sex with their bodies when they were unconscious.

Both Petroske and Lazzaro took their cases to trial, and both men testified.  Petroske largely admitted his conduct in his testimony.  *United States v. Petroske*, No. 17-cr-116 (PJS/LIB) (D. Minn. Apr. 5, 2018), ECF No. 119 at 41–42. ("Mr. Petroske admitted virtually all of the material facts of this case.  He took the stand and, in testimony that seemed honest, admitted that he had done everything that the government accused him of doing.").  In contrast, Lazzaro lied extensively.

Additionally, Petroske did not distribute the child pornography that he created and—critically—in the Court's view, expressed remorse for his behavior.  *Id.* at 42 ("Mr. Petroske seems to be remorseful, and since being arrested he has done everything that he can to try to understand his illness and how he can control it.").  Lazzaro has not—never once—expressed remorse for his conduct—never a hint of regret for the great harms he caused.  Lazzaro obstructed justice extensively.  Petroske never did.  While Petroske had a prior conviction for similar conduct, as the Court saw at trial, Lazzaro is also a repeat and dangerous sex offender, and engaged in similar conduct in other locations.  The Court handed down a fair and just sentence for Petroske of 20 years.  Given these stark differences, Lazzaro should receive significantly more.

In *United States v. Fortier*, No. 17-cr-96 (PJS/DTS) (D. Minn. Dec. 29, 2022), ECF No. 191, this Court sentenced Scott Francis Fortier to 300 months' imprisonment following his conviction at trial on one count of possession of child pornography and one count of production of child pornography.  Fortier was a former camp counselor who spent time with girls under the age of 18 at his former place of employment.  Like Lazzaro, Fortier groomed and had sex with these girls.  Fortier convinced young girls to confide in him

about their struggles in school and other problems. Like Lazzaro, he plied them with alcohol. Like Lazzaro, he produced recordings of the girls he was with. Fortier's recordings constituted child pornography of his sexual encounters with a 15-year-old victim and a 16-year-old victim. One of the recordings depicted Fortier having sex with a 15-year-old unconscious girl—eerily familiar to Victim C's description of her sexual encounters with Lazzaro. And like Lazzaro, Fortier took the stand and committed perjury, claiming that the recordings were the result of a mistake or accident. But Lazzaro victimized more girls than Fortier, and he engaged in multiple commercial sex acts with each one. Moreover, Lazzaro conscripted and corrupted Castro Medina to join him in his criminal enterprise. Lazzaro's conduct cries out for a sentence of more time—30 years' imprisonment.

Lazzaro has repeatedly cast himself as nothing more than a sex consumer, or a "john." To be sure, those found to be sex buyers often receive shorter sentences than traffickers. But these cases are factually distinguishable from Lazzaro's conduct as both a buyer and trafficker who retraumatized his victims by forcing them to testify in a highly publicized trial. *See United States v. Amos Kiprop Koech*, 18-cr-18-02 (DWF/LIB)[3] (sentencing the defendant, after trial, to 130 months' imprisonment and 10 years of supervised release for engaging in one commercial sex act with a single 15-year-old

---

[3] Perhaps a more apt comparison would be to Koech's codefendant, Andre Mathis, Jr., who received a sentence of 292 months and 20 years of supervised release after pleading guilty to one count of sex trafficking the 15-year-old minor. *United States v. Mathis*, No. 18-cr-18-01 (DWF/LIB), ECF No. 203.

victim); *United States v. Humberto Rangel-Torres*, 19-cr-319-02 (ECT/TNL) (sentencing a defendant who pleaded guilty and was prepared to testify against his codefendant to 72 months' imprisonment and 5 years of supervised release for engaging in three commercial sex acts with a single victim).

The prosecution team is not aware of any case in this District or elsewhere with the same combination of five minor victims and amount of commercial sex acts.[4] The case of Ghislaine Maxwell, the 61-year-old recruiter for Jeffrey Epstein, may be apt. After trial, Maxwell was sentenced to 240 months for assisting Epstein in sex trafficking minors. Four victims testified at the trial. Given Lazzaro's role, the number of victims, and the harm inflicted on them, a sentence of 360 months would avoid unwarranted disparities.

---

[4] This Court can assess the comparative value of the sentences imposed in sex trafficking cases in this District.   Those include Omar Kashaka Taylor, 18-cr-88 (DWF/ECW), who was sentenced to 400 months' imprisonment and 25 years of supervised release for trafficking a 17-year-old minor victim and an 18-year-old adult victim in 2017. Deuvontay Shelby Charles, 16-cr-65 (JNE/FLN), was sentenced to 432 months' imprisonment and 20 years of supervised release for trafficking three minor victims aged 17, 17, and 14 years old. Charles also was convicted of child pornography offenses. Arthur James Chappell, 09-cr-139 (JNE/JJK), was sentenced to 336 months and Markeace Arque Canty, 13-cr-110 (JNE/LIB), was sentenced to 300 months for sex trafficking offenses involving three minors after trial. Lee Andrew Paul, 15-cr-48 (ADM/SER) was sentenced to 396 months for sex trafficking one adult and two minors after trial. Philip Dwayne Loyd, 15-cr-142 (JRT/SER) (Doc. No. 123), who qualified as a recidivist offender, was sentenced to 324 months and 20 years supervised release for the production of child pornography and sex trafficking of a minor upon a guilty plea. Dontre D'Sean McHenry, 14-cr-203 (DSD/FLN) (Doc. No. 92), was sentenced to 293 months and lifetime supervised release for sex trafficking a minor upon a guilty plea. And Rahmad Lashad Geddes, 14-cr-394 (DWF/LIB) (Doc. No. 107) was sentenced to 282 months and lifetime supervised release for sex trafficking a 19-year-old adult by force, fraud or coercion after trial.

## RESTITUTION REQUEST

Restitution is not only appropriate but required in this case.  18 U.S.C. § 1593. Lazzaro must pay the "full amount" of each victim's losses, which includes: (A) medical services relating to physical, psychiatric, or psychological care; (B) physical and occupational therapy or rehabilitation; (C) necessary transportation, temporary housing, and child care expenses; (D) lost income; (E) reasonable attorneys' fees, as well as other costs incurred; and (F) any other relevant losses incurred by the victim. 18 U.S.C. § 2259(c)(2). The government bears the burden of proving the amount of restitution based on a preponderance of the evidence, *United States v. Hoskins*, 876 F.3d 942, 945 (8th Cir. 2017).

Dr. Sharon Cooper testified at trial about the varied impacts of sex trafficking on its victims. She identified four different categories. Trial Tr. Vol. I at 95. First, is physical health. Victims of sex trafficking are at higher risk for significant health problems. Second, victims will typically have problems with drug and alcohol abuse if they had been given drugs or alcohol during the course of their victimization. *Id.* at 96. Third, victims are at higher risk of sexually transmitted infections, infertility, and major gynecological problems, including cancer. *Id.* Fourth, victims have significant psychological impact, including posttraumatic stress disorder (PTSD). *Id.* "Anxiety is extremely common. Panic attacks, very often. Depression. The leading cause of death in sex trafficking victims is suicide, and the second leading cause of death is HIV followed by homicide." *Id.* at 96–97. Such physical and mental health consequences can manifest even when the victim has been sex trafficked on just one or two occasions. As Dr. Cooper testified, "We can see victims

37

who have only had one encounter who are highly traumatized individuals, and especially when there's been alcohol facilitation because the victim doesn't really have a complete memory, necessarily, around the time of their victimization, which then leads them to imagine what may have happened . . . that causes them to have even more anxiety over what they feel they cannot remember." *Id.* at 99–100.







## OTHER MONTEARY PENALTIES

Lazzaro is not indigent, so he should be ordered to pay $5,000 per each count of conviction to the Domestic Trafficking Victims' Fund totaling $30,000. PSR ¶ 144. An additional $100 special assessment for each count goes to the Crime Victims' Fund. PSR ¶ 143. Finally, restitution to the victims is of primary importance, so the government defers to the Court as to whether imposition of a fine is necessary on top of the mandatory restitution and forfeiture of facilitating assets. Indeed, when the government rightly returned the cash and precious metals that had been seized in December 2020, undersigned counsel noted that it would comment favorably at sentencing if Lazzaro had put away that money to cover mandatory restitution to the victims. It is unclear if this has happened.

## <u>CONCLUSION</u>

Victim A implores this Court: "I just want justice, so my 16-year-old self can heal. I know someday soon I'll be free again." PSR ¶ 43, p.12.

In this case, considering all the sentencing factors, the government respectfully requests that this Court impose on Anton Joseph Lazzaro a sentence of 360 months of imprisonment, at least 10 years of supervised release, and restitution to his victims. This is called for under the applicable statutes, advisory sentencing guidelines, and an assessment of the § 3553(a) factors. And it is just. Nothing less than such a sentence would accomplish federal sentencing goals.

Dated: July 31, 2023                    Respectfully submitted,


                                        ANDREW M. LUGER
                                        United States Attorney

                                        _s/_ _Laura M. Provinzino_
                                        BY: LAURA M. PROVINZINO
                                        Assistant United States Attorney
                                        Attorney ID No. 0329691

                                        EMILY A. POLACHEK
                                        Assistant United States Attorney

                                        MELINDA A. WILLIAMS
                                        Assistant United States Attorney