UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S POSITION REGARDING |
| | ) | SENTENCING |
| vs. | ) | |
| | ) | |
| Anton Joseph Lazzaro, | ) | Criminal 21-173 (PJS/DTS) |
| | ) | |
| Defendant. | ) | |

Defendant Anton Joseph Lazzaro, through his counsel, Daniel L. Gerdts, Esq., and Steven L. Kessler, Esq., respectfully submits this Position Regarding Sentencing pursuant to Local Rule 83.10(e).

OBJECTIONS TO THE PRESENTENCE REPORT

Defendant Lazzaro continues to object to a variety of legal conclusions and factual assertions in the presentence report. They are set forth below along with argument as appropriate.

Paras. 7 through 164: Defendant specifically objects to all factual assertions stating or implying that he engaged in commercial sex acts of any kind or that he exchanged money for sex. He reserves the objection here for every time it is asserted in the PSR. He likewise objects to all instances in the presentence report that makes reference to, or assertions that, anybody was a "victim" in this case. This objection will

not be repeated in every instance, but is here asserted for all occurrences.

Para. 8: This paragraph offers the first example of the factual assertions just referenced above. It asserts that there was an agreement with Castro-Medina to recruit minor females to engage in commercial sex acts with Lazzaro. While there was indeed an agreement with Castro Medina to assist him in meeting young females (both adult and teens at least 16-years-old) with the hopes of engaging in sexual activity with them, there was no expectation of sex at all, and certainly not commercial sex. As the evidence at trial established, money and gifts were to given to *all* of his friends and house guests, regardless whether he had sex with them. The money and gifts were not given "in exchange for" sex, or "on account of" the sexual activity.

Para. 10: The Government does not allege that F is a an "attempted victim." The attempt allegation was dropped before trial for lack of proof.

Para. 12: Defendant never "listed several sex acts and what he would pay for each." According to the testimony, Gabbie started kissing him, and they ended up making out and having sex. *See* Tr. at 288:

> A. We got more drunk, and Gabbie took a shot of Grey Goose
> or more, I don't remember, but the point is we got really
> intoxicated. And Gabbie started kissing Tony, and shortly
> after, they had sex.
> Q. So it escalates pretty quickly?
> A. Yes.

There was never any discussion regarding sex for money, and no testimony to support it. To the contrary, with Gabbie, as set forth above, it was she who spontaneously came

on to Tony. Later (with Castro Medina), it was just "impulsive." *See* Tr. at 290:

> Q. Did you enjoy the sex you had with the defendant?
> A. No, not particularly.
> Q. Why do you think you did it?
> A. It was very impulsive. It was -- I don't know. I almost didn't even think twice about it.

Para. 20: Emily testified that she did not drink much on the evening in question and that neither she nor anyone else had sex that night. *See, e.g.*, Tr. at 197:

> Q. Okay. Emily, how much alcohol do you think you drank that night?
> A. That first night I don't think I drank too much. I would say we only had champagne, so it didn't have much of an effect, versus harder liquor, but I would say a glass or two of the champagne.

The other minor did *not* testify that she believed anybody had engaged in sexual activity. She *did* testify as to her observations about Emily being drunk and falling, but that was contradicted both by Emily and also by Bella (whom the Government chose not to call as a witness).

Para. 21: The last sentence is unsupported by the record. *See* Tr. at 214:

> Q. Was there another time you ended up going back to Tony's with Chloe?
> A. With Chloe?
> Q. Yeah.
> A. No.

Para. 22: Lazzaro picked up Emily that day, and never suggested a plan to pick up Chloe.

Para. 23: The testimony was clear that Chloe only visited Lazzaro once.

Para. 40: At no time did Lazzaro attempt "to unlawfully influence them," a

reference to Gabbie and Emily.

Para. 43: Defendant Lazzaro objects to restitution in this case. This paragraph is new, and does not appear to be complete (based on communications with government counsel), nor is supported with actual evidence of any compensable harm.

Para. 45: Lazzaro objects to the suggested adjustment for obstruction, and to the factual assertion that he "attempted to influence two victims." As the Court will recall, a lawyer prepared a non-disclosure agreement after Gabbie began openly making extortionate threats against Lazzaro. The attempt to resolve the extortion demands was not an attempt unlawfully to influence her. The referenced visit to Emily was not an attempt to have her say that she was 16 at the time they had sex. The Court viewed the "Dairy Queen Video" at trial. Lazzaro had confronted her about her real age (of 15), and she continued to lie about it. For the purposes of the charged conduct here, of course, it makes no difference whatsoever whether she was 15 or 16.

Para. 46: This paragraph and its factual assertions are brand new. Defendant Lazzaro objects to all factual assertions therein. He did not commit perjury.

Para. 52: The specific offense characteristic of "undue influence" does not apply in this case. As the commentary notes, the Court must "determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior." A presumption of such influence applies when the age difference between an offender and a minor is at least ten years – but it is rebuttable. In this case there was

never any suggestion that the minors' behavior was not voluntary. As the court noted in *United States v. Davis*, 924 F.3d 899 (6th Cir. 2019), "[i]n cases where there is significant record evidence that undercuts this presumption, such as this one, a district court cannot rely solely on the presumption to determine that the defendant has 'compromised the voluntariness of the minor's behavior.'" *Id*. at 904.

It is clear from most of the evidence in this case that all of the minors were eager and excited about their extremely brief relationships with Mr. Lazzaro. *See, e.g.,* Tr. at 174 ("we were all a little bit nervous and excited about it"); 230 ("Q. And you were excited to go back there; is that right? A. After the first time, yes, we were excited to go back, and she was excited to meet him, yes."); Tr. at 571 ("Emily was like bragging about it, kind of like excited"); Tr. at 905 ("A. At the time I was kind of excited because it was kind of a trend or kind of popular, like, kind of around the people my age and at my school a little bit to, like, have a sugar daddy. Like, people thought that that was cool."); *see also* Defendant's Ex. 6 (attached).

Para. 53: The specific offense characteristic of use of a computer does not apply because the use of the computer must somehow "persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct." Merely using a computer or a computer application to communicate with someone does not alone qualify; there must be some causal relationship with prohibited sexual conduct. The commentary also makes clear that it applies only to direct communications with a

minor. In this case there was absolutely zero evidence that sex or sexual conduct of any kind was ever discussed or made reference to in any of the communications with the minors. Even if there had been an explicit invitation to have sex, that also would *not* qualify because such conduct would not otherwise have been unlawful or prohibited. If the communications were solicitations to engage in prostitution, that would be different (and is obviously what the adjustment is intended to cover), but nothing close to that happened in this case with any of the minors.

Para. 57: For reasons already discussed above, the obstruction enhancement does not apply.

Para. 58: The adjusted offense level should be 32.

Para. 60: For the same reasons already discussed above, an undue influence adjustment does not apply.

Para. 61: For the same reasons already discussed above, the computer enhancement does not apply.

Para. 66: The adjusted offense level should be 32.

Para. 68: For the same reasons already discussed above, an undue influence adjustment does not apply.

Para. 69: For the same reasons already discussed above, the computer enhancement does not apply.

Para. 73: As noted above, the recording of Emily's attempt to convince Lazzaro

that she had not lied cannot conceivably constitute obstruction by Lazzaro, and this report does not attempt to explain why. In the context of the charges in this case, it makes no difference whatsoever whether she was 15 or 16 or 17. Castro-Medina's provision of gifts to Emily after Emily expressed her concern that Lazzaro didn't like her any more cannot possibly constitute an attempt to obstruct justice.

Para. 74: The adjusted offense level should be 32.

Para. 76: For the same reasons already discussed above, an undue influence adjustment does not apply.

Para. 77: For the same reasons already discussed above, the computer enhancement does not apply.

Para. 82: The adjusted offense level should be 32.

Para. 84: For the same reasons already discussed above, an undue influence adjustment does not apply.

Para. 85: For the same reasons already discussed above, the computer enhancement does not apply.

Para. 90: The adjusted offense level should be 32.

Para. 91: The adjusted offense levels referenced in the chart should be corrected to reflect all of the above, but this change does not affect the number of "units" in any way.

Para. 92: The greater of the adjusted offense levels should be 32.

Para. 94: The combined adjusted offense level should be 36.

Para. 95: This enhancement does not apply. As the commentary to this guideline explains,

> This guideline applies to offenders whose instant offense of conviction is a sex offense committed against a minor and who present a continuing danger to the public. The relevant criminal provisions provide for increased statutory maximum penalties for repeat sex offenders and make those increased statutory maximum penalties available if the defendant previously was convicted of any of several federal and state sex offenses (see 18 U.S.C. §§ 2247, 2426).  In addition, section 632 of Public Law 102–141 and section 505 of Public Law 105–314 directed the Commission to ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual abuse or exploitation of minors.

U.S.S.G. § 4B1.5, comment. n. 5 (background). Mr. Lazzaro has no criminal history whatsoever, and as the evidence at trial and elsewhere established, he actually made a conscious effort to conform his conduct to what the law expressly permits by pursuing sexual relations only with persons who were at least 16 years of age. The only occasion in which he erred was induced by a fraudulent representation. There is no evidence that he represents a danger of recidivism and no evidence to support a finding that he is a "continuing danger to the public." To the contrary, the available evidence suggests a contrary finding. *See, e.g.*, United States Sentencing Commission, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021) (available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010).

Application of this enhancement to the facts of this case would also constitute

double punishment for the same conduct that justified the 4-level "multiple count" adjustment above. The counts are not combined as they ordinarily would be in a conspiracy case because they involve different minors, but this enhancement *also* is based on the fact that there are multiple "minor victims."

Para. 97: The total offense level is 36.

Para. 105: Defendant objects to the suggestion that he violated legal mail privileges while in pretrial detention. While there appears to be evidence that his former counsel may have crossed a line regarding that privilege, it certainly should not be attributed to Defendant.

Para. 148: Defendant objects to the restitution requested in this paragraph, noting the absence of any identified compensable harm.

Para. 134: Based on a total offense level of 36 and a criminal history category of I, the guideline imprisonment range is 188 to 235 months.

FORFEITURE

I.   The Government's Motion for Forfeiture Should Be Denied.

The government has released or agreed to release almost all of the property seized from Mr. Lazzaro. Three items of real and personal property remain: (1) a Blackberry cellphone ("the Blackberry"); (2) a 2010 Ferrari automobile ("the Ferrari"), and (3) a condominium located 201 11th Street South, #1920, Minneapolis, MN, that Mr. Lazzaro owns jointly with an innocent third party, Kira Costal ("the

Condo"). The government now moves for a Preliminary Order of Forfeiture with respect to these properties. *See* Doc. No. 411, filed 7/6/23 ("the Motion"). The government's Motion should be denied in all respects. None of these properties are properly subject to forfeiture.

II.     Legal Standard.

The procedures relating to criminal forfeiture are governed primarily by Rule 32.2 of the Federal Rules of Criminal Procedure. Rule 32.2 applies to the "forfeiture phase" of the criminal proceeding. Fed. R. Crim. P. 32.2(b). Where, as here, "the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense." Thus, the government has the burden of proving, by a preponderance of the evidence, that the specific property it seeks to forfeit has the requisite "nexus" to the offense. *Id*.; *see United States v. Peithman*, 917 F.3d 635, 651 (8th Cir.), *cert. denied*, 140 S. Ct. 340 (2019).

As this Court has previously noted, criminal forfeiture is limited to "tainted property; that is, property flowing from or used in the crime itself." *See* Order, Doc. No. 188, filed 4/22/22 (quoting *Honeycutt v. United States*, 137 S. Ct. 1626, 1632 (2017)). The applicable statutes refer to this property as "proceeds" or property that facilitated or was "involved in" the criminal activity. *See* 21 U.S.C. § 853(a)(1)-(2)

(general criminal forfeiture provisions); 18 U.S.C. § 1594(e) (trafficking forfeiture

provision).[1]

There is no claim that the proceeds of any criminal activity were used to

purchase the Blackberry, the Ferrari or the condo.  Rather, the government seeks to

forfeit the property solely on the ground that it was "involved in" or facilitated the

offense.  *See, e.g.*, Motion at p. 5 (asserting that "the Property was all 'involved in'

Lazzaro's violations here, in addition to having been 'used . . . to commit or facilitate

the commission of' his sex trafficking violations").[2]

---

[1] This Court previously rejected the government's contention that 21 U.S.C. § 853
is inapplicable to the forfeiture claims in this case.  See Order, Doc. No. 188, at p.6
("Section 1594 is subject to provisions of the criminal forfeiture statute, which is
governed by 21 U.S.C. § 853"); *id.* at p. 6, fn. 4 ("18 U.S.C. § 1594(e)(2) extends
the provisions of the criminal forfeiture statute, 18 U.S.C. § 982, to seizures under §
1594(e).  Under § 982(b)(1), the forfeiture of property 'including any seizure and
disposition of the property and any related judicial or administrative proceeding,
shall be governed by' 21 U.S.C. § 853").
    Remarkably, however, the government still refuses to acknowledge the
applicability of section 853 in the Motion, except when mentioning third-party
claims.  *See* Motion at p.4.

[2] The government has also previously argued that "involved in" property is different
from facilitating property, although it appears to have abandoned that contention.
Indeed, such a contention is contrary to the law in this Circuit.  *See, e.g., United
States v. Beltramea*, 849 F.3d 753, 758 (8th Cir. 2017) ("On appeal, Beltramea argues
that the government has waived any argument that this is an 'involved in' case.  We
disagree and find that, in fact, forfeiture is warranted in this case because Castlerock
was utilized to facilitate the laundering offenses; that it was 'involved in' Counts 4
and 7"); *see also United States v. Huber*, 404 F.3d 1047, 1061 (8th Cir. 2005)
("facilitation under section 982(a)(1)'s 'involved in' clause is geared at the
forfeitability of instrumentalities . . . that facilitate (or promote) the . . .
transactions").

The government's presentation of the applicable legal standard, however, omits a crucial element. "[I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a *substantial connection* between the property and the offense." 18 U.S.C. § 983(c)(3) (emphasis added). This key element has been highlighted by the Eighth Circuit. *See United States v. Hull*, 606 F.3d 524, 527-28 (8th Cir. 2010) ("The evidence showed a substantial connection – not merely an incidental or fortuitous relationship – between the real property and the offenses"); *United States v. Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn.*, 480 F.3d 841, 843 (8th Cir. 2007).

Thus, "CAFRA now requires, as part of the government's case-in-chief, that it prove to the jury that there was a substantial connection between the property and the offense." *von Hofe v. United States*, 492 F.3d 175, 186 (2d Cir. 2007) (citations and internal quotations omitted); *United States v. Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn.*, *supra* at 843 (same).

As the Eighth Circuit noted in *Hull*, to establish a "substantial connection" between criminal activity and property sought to be forfeited on the ground that it was "involved in" or facilitated the offense, the government must prove by a preponderance of the admissible evidence that the relationship between the property

and the offense was more than "incidental" or "fortuitous." *Hull*, *supra*, 606 F.3d 524, 527-28; *see also United States v. Parcel of Property*, 337 F.3d 225, 233 (2d Cir. 2003) (jury instruction that "[t]here must be more than an incidental or fortuitous connection between the property and the illegal activity, but the property need not be indispensable to the commission of the offense" held to be sufficient under CAFRA); *see also United States v. 5 S 351 Tuthill Rd., Naperville, Ill.*, 233 F.3d 1017, 1025 (7th Cir. 2000).

As demonstrated below, the government has failed to satisfy its burden of demonstrating, by a preponderance of the evidence, that there is a substantial connection between the offense and any of the property sought to be included in the Preliminary Order of Forfeiture.

III.    The Blackberry Is Not Subject to Forfeiture.

It is undisputed that Mr. Lazzaro owns a number of cellphones and other electronic devices ("the electronic devices"). All of them, except a Google Pixel, were seized when his home was searched in December 2020.  The Pixel was seized from Mr. Lazzaro on August 12, 2021, when he was arrested.

The forfeiture allegations of the indictment list each of the seized electronic devices. *See* Indictment ¶ 11(2)(d)-(y).  They include Apple and Microsoft Windows laptops and tablets, Apple iPhones, cellphones made by Motorola, LG and other manufacturers, 14 SD cards, four thumb drives, a GPS, two Blackberry cellphones

and an Alcatel TCL phone based on the Blackberry operating system that the company licensed to other manufacturers after it stopped making its own products in 2016 – five years before Mr. Lazzaro's arrest.[3] Thus, the Blackberry sought to be forfeited – listed at ¶ 11(2)(u) of the Indictment – was at least five years old at the time it was seized.

The government has never made any showing that any of the electronic devices have a nexus to the criminal activity, let alone a substantial connection. Unlike the other seized property, the government's purported basis for retaining the electronic devices was as "evidence," although it claimed that, at some point in the future, it would demonstrate that the electronic devices were subject to forfeiture pursuant to an actual criminal forfeiture statute. *See, e.g.*, Order, Doc. No. 188, at 4-5 ("The government . . . stat[es] that, although it will seek forfeiture of the electronic devices, it is currently holding the devices as evidence and not based on being subject to forfeiture").

The government originally seized the electronic devices to support child pornography charges. *See* Doc. No. 75-2, filed 10/28/21 (12/14/20 Search and Seizure Warrant attached as Exhibit "B" to Lazzaro Motion). However, no pornography charges were ever filed, which was understandable since nothing to support such charges was found anywhere, let alone on any of the electronic devices.

---

[3] See https://en.wikipedia.org/wiki/BlackBerry.

As this Court noted in denying Mr. Lazzaro's motion to release the electronic devices, "[w]hen property is seized as evidence in a criminal case, the government is justified in retaining it for use in criminal proceedings." Order, Doc. No. 188, at pp. 4-5 (citing *Jackson v. United States*, 526 F.3d 394, 397 (8th Cir. 2008)).

Now, with the conclusion of the trial, the government appears to be returning, or has promised to return, every seized electronic device *except* the Blackberry. *See, e.g.*, Motion at p.2, fn. 2 ("The United States is no longer seeking forfeiture of . . . the Apple iPhone . . . and the Google Pixel 4A cellphone . . .. These items will be returned after they are no longer needed as evidence in connection with this case"). Indeed, the Blackberry is the only electronic device sought to be included in the Preliminary Order of Forfeiture.

The government's entire proof of nexus between the Blackberry and the offenses is as follows:

> Throughout the conspiracy, Lazzaro communicated with coconspirator Gisela Castro Medina through electronic means, including communications that were involved in, and which facilitated, the conspiracy. Castro Medina testified that Lazzaro would typically use his Blackberry cellphone, and "He loved his Blackberry. He Really enjoyed it." Trial Tr. Vol. 2 at 351:5-23. Castro Medina testified that Exhibit J-20, a photo of Lazzaro holding stacks of cash, included an apparent reflection of Lazzaro's Blackberry cellphone. Id. Lazzaro testified that he gave Stella an iPhone because he typically used Blackberry phones. Trial Tr. Vol. 5 at 1316:4-14. (Motion at p.6).

This is not even a "nexus," let alone a "substantial connection." Testimony that Mr. Lazzaro "loved his Blackberry" does not establish that he used it to facilitate

the conspiracy. "[A]n apparent reflection of Lazzaro's Blackberry cellphone" in a photo is equally nonprobative. Further, none of the "[e]xamples of electronic communications that were part of the conspiracy" cited in the Motion have any evidentiary connection to the Blackberry sought to be forfeited. Motion at p.7 (citing Snapchat communications).

Similarly, testimony that Mr. Lazzaro "typically used Blackberry phones," while interesting, is insufficient to establish a nexus to the particular Blackberry sought to be forfeited. In fact, Mr. Lazzaro had at least two Blackberry-branded phones and another phone, the Alcatel TCL, that utilized the Blackberry operating system and Blackberry design, with the physical keyboard below the screen. Indeed, from 2016 through 2020, a "Blackberry" *was* a TCL phone in this country.[4]  Yet, the

---

[4]  *See, e.g.,*  https://www.theverge.com/2020/2/3/21120107/tcl-blackberry-ends-phone-global-rights-date-2020:

> The brand keeping BlackBerry phones alive across most of the globe, TCL Communications, plans to stop selling BlackBerry phones later this year. In a tweet this morning, TCL announced that it 'will no longer be selling' BlackBerry-branded phones as of August 31st, 2020, because it will no longer have the rights to design and manufacture them. Existing devices will continue to be supported.
>
> BlackBerry decided in 2016 to stop making its own phones, after years of failures, and to license its brand out instead. The biggest licensing deal was with TCL, which since December 2016 has had the near-global rights to design and sell BlackBerry-branded phones. It's done a decent job of it, pairing classically BlackBerry-style designs with the functions of modern Android phones.

*Id.*

government is apparently not seeking to forfeit either Mr. Lazzaro's other Blackberry phone or the TCL phone.  The Motion provides no explanation for these decisions.

Unfortunately for the government, its motion suggests an explanation for its tactic that further diminishes its forfeiture claim against the Blackberry. As their papers acknowledge, "the Government was unable to search the contents of the Blackberry phone . . .."  Motion at p.10. Therefore, not only does the government *not* connect the Blackberry to any criminal activity, but the government concedes that it has no direct probative evidence that the Blackberry was "involved in" or facilitated any criminal activity, let alone that there was a "substantial connection" between any offense and the device.

Further, the government's concession suggests that it *was* able to "search the contents" of Mr. Lazzaro's other electronic devices and did not find a "nexus" between any of those devices and the criminal activity. This inference is supported by the fact that the government is not seeking to include any of the other electronic devices in the Preliminary Order of Forfeiture. In sum, the government has failed to sustain its burden of demonstrating that the Blackberry is subject to forfeiture. Accordingly, its Motion must be denied with respect to this property.

IV.     The Ferrari Is Not Subject to Forfeiture.

The government also has failed to establish a substantial connection between Mr. Lazzaro's Ferrari and the criminal activity.

It is undisputed that among the dozens of events that form the basis for the criminal charges, the Ferrari was used only once.  In light of all of the evidence, this single use is insufficient to satisfy the government's burden of proof for establishing a nexus between the property sought to be forfeited as "involved in" the criminal activity and the offense. Fed. R. Crim. P. 32.2(b).

As the Court held in its Order on Mr. Lazzaro's motion for reconsideration, the probable cause determination underlying the issuance of the warrant authorizing the seizure of the Ferrari is no longer relevant:  "In the event Lazzaro is convicted, he will have an opportunity to litigate whether the vehicle was in fact substantially connected to the charged crime during forfeiture proceedings under 21 U.S.C. § 1954."  Order, Doc. No. 205, filed 5/31/22, at p.2. The government does not claim otherwise.

The Ferrari is sought to be forfeited because of a single use on October 4, 2020.  *See, e.g.*, PSR at pp. 8-9.  In all of the other events that form the basis for the offenses of conviction, the victims were transported to and from the condo by private car.  *Id.* ¶¶ 12, 20, 21, 35.  Indeed, the government relied on "car service records" to support its case.  *Id.* at p. 38. Further, although a central allegation is enticement through money or gifts, there was no claim that the Ferrari was ever used or intended to be used as an enticement.

"There must be more than an incidental or fortuitous connection between the property and the illegal activity . . . ." *E.g.*, *United States v. Parcel of Property*, 337 F.3d at 233. Here, the best the government could argue is that the use of the Ferrari was incidental to any criminal activity  No connection is present here, let alone a "substantial" one.  Not only was the Ferrari used once to pick up one of the minors, but it was not even used to drive that minor back home.  Mr. Lazzaro used a different vehicle – one not being sought for forfeiture – to drive her home.  Thus, the single use of the Ferrari falls far short of the substantial connection required for forfeiture of facilitating or "involved in" property.

Further, even if it were determined that such use of the Ferrari could be deemed a substantial connection to the criminal activity, the forfeiture of a vehicle with a book value in the neighborhood of $100,000 for a single illegal use would violate the proportionality principle that underlies the "substantial connection" requirement. *See, e.g.*, *United States v. Bajakajian*, 524 U.S. 321, 336-38 (1998).[5]

In sum, the government has failed to sustain its burden of demonstrating, by a preponderance of the evidence, that there is a substantial connection between the

---

[5] The government apparently seeks to evade the proportionality issue by alleging that "[t]he value of the Ferrari could not be determined, as it appears the uniqueness of this vehicle excludes it from open-source vehicle value estimators."  PSR ¶ 134. If anything, such a view would only *increase* the value of such a limited production vehicle.

Ferrari and offense. Accordingly, the Ferrari should also be excluded from any forfeiture order issued in this case.

V.      The Condo Is Not Subject to Forfeiture.

Finally, the government's attempt to forfeit the Condo should be denied, as the government has failed to sustain its burden of establishing a substantial connection between the property and the offenses. Further, such forfeiture would violate the proportionality principle that underlies the "substantial connection" requirement. Finally, the forfeiture of the Condo would deprive an innocent third party of her legal and possessory interest in the property.

While it may appear that the Condo was "involved in" the offenses, that involvement falls short of a substantial connection. The government does not allege otherwise. To the contrary, the use of the Condo was incidental and fortuitous with respect to the criminal activity.

The government largely relies on *United States v. Hull*, *supra*, to make its forfeiture case against the Condo.  Motion at pp. 7-8.  The government's reliance is misplaced. As noted above, but omitted from the government's quote from the decision, the Eighth Circuit in *Hull* specifically held that there *was* a substantial connection between the real property and the offense in that case.  A fuller quote of the passage selected by the government demonstrates that *Hull*'s analysis actually supports Mr. Lazzaro:

We think it clear that Hull 'used' his real property 'to commit' or 'to promote the commission of' the child pornography offenses. He set up a computer in a room in his house, connected to the Internet, and distributed child pornography from there. The evidence showed a *substantial connection – not merely an incidental or fortuitous relationship – between the real property and the offenses*. To be sure, use of the computer was necessary to commit the offenses, but the real property played a substantial role as well. The house enabled Hull to establish a hardwired connection to the Internet, which allowed him to distribute the contraband.  It also provided a secure place to store the images that he later distributed.  Use of a computer in the privacy of the residence, rather than in a library, coffee shop, or senior center, made it easier for Hull to conceal his crimes from public scrutiny. Hull posits that he could just as easily have used a motel room, but use of the residence avoided rental costs and the attention that would be attracted by frequent visits to local motels.

*United States v. Hull*, 606 F.3d at 527-28 (emphasis added).

It is unfortunate for the government that the case it must look to as support as "the most analogous Eighth Circuit case" (Motion at p.7) is *Hull*, as it demonstrates by contrast that the Condo is *not* subject to forfeiture. In *Hull*, the defendant was convicted of the precise criminal activity that the government could not even allege against Mr. Lazzaro – child pornography – because there was not a shred of proof in any of his property or seized electronic devices to support such charges.

Thus, the Eighth Circuit's analysis in *Hull* of the substantial connection between the defendant's property and his child pornography offenses is a poor fit here. As the Circuit noted in *Hull*, the privacy provided by the defendant's real property "played a substantial role" in his criminal activity.  It gave him a safe haven to "distribute the contraband" and "provided a secure place to store the images that

he later distributed." *Hull*, 606 F.3d at 528. It is clear, as the court noted, that it would have been extremely risky for the defendant to utilize a public space for his activities: "Use of a computer in the privacy of the residence, rather than in a library, coffee shop, or senior center, made it easier for Hull to conceal his crimes from public scrutiny." *Id.*

Mr. Lazzaro was not dealing in "contraband." There was no evidence that he was hiding his relationships with the "victims". To the contrary, on at least one occasion, he met one of the minors at the Mall of America to purchase a gift. *See* PSR ¶ 24. Unlike the defendant in *Hull*, Mr. Lazzaro truly could have used a hotel room or a rental property to engage in the activities for which he was convicted. Thus, there is no "substantial connection" between the Condo and any criminal activity.

Further, forfeiture of the Condo, valued at approximately $1.5 million,[6] would be grossly disproportional to the offense. Notably, the restitution amounts requested suggest that the alleged harm to the victims was minimal. *See, e.g.*, PSR ¶ 138 ("The following restitution, totaling $41,917.66, has been requested as of this writing: $2,782.53 to MN Crime Victims Reparation Board/ $1,994.23 to Gabbie/$35,753.83

---

[6] Another similar condominium residence at the Ivy is presently listed for more than $1.5 Million. *See* https://www.realtor.com/realestateandhomes-detail/201-S-11th-St-Unit-2220_Minneapolis_MN_55403_M83425-73726?from=srp-list-card

to Stella/$1,387.07 to Estella (additional amount anticipated)"). It appears that the compensation being sought is for alleged future therapy. While an additional amount of approximately $700,000 has been requested, that is also for alleged future therapy, not damage that reflects "loss" typical for restitution. This makes the proportionality issue even more tenuous and problematic for the government.

Further, it is undisputed that Mr. Lazzaro's girlfriend of three years, Kira Costal, an innocent third party, is a co-owner of the Condo. PSR ¶ 133. She also resides permanently in the Condo. She continues to attend college and "assists [Mr. Lazzaro] in managing his business and finances while he is detained." *Id.* ¶ 108.

Forfeiture of the Condo would deprive Ms. Costal of her legal and possessory interests in the property. Those interests are substantial and entitled to protection. This is particularly so here, as Ms. Costal was evicted by the HOA Board from her prior residence because she testified before this Court on Mr. Lazzaro's behalf.

"Under 21 U.S.C. § 853(n), a third-party who innocently acquires an interest in the subject property is protected to the extent of that interest even though the defendant may have subsequently exercised some dominion or control over the property." *United States v. McCollum*, 443 F. Supp. 2d 1154, 1166 (D. Neb. 2006) (citing *United States v. Totaro*, 345 F.3d 989, 997 (8th Cir. 2003)); *cf. United States v. One Lincoln Navigator*, 328 F.3d 1011, 1014 (8th Cir. 2003) ("an innocent owner's interest" in property "shall not be forfeited") (quoting 18 U.S.C. § 983(d)).

In sum, the government has failed to sustain its burden of demonstrating that the Condo is subject to forfeiture as property involved in the offense. Accordingly, the government's Motion to include the Condo in a Preliminary Order of Forfeiture should be denied.

## ADDITIONAL SENTENCING CONSIDERATIONS

The Court's discretion in this case is limited by Congress's requirement of a ten-year minimum sentence. The Court should exercise its remaining discretion to impose a sentence no greater than 120 months of imprisonment. The statute at issue, § 1591, prohibits a very wide range of prospective conduct. This case falls in the margins. It is certainly unusual, and not quite what Congress had in mind when it promulgated the statute. In a recent letter from John Cornyn, the law's chief sponsor in the Senate, he observed that "The JVTA focuses on reducing the demand-side of the issue by charging the purchasers of these sex acts when they purchase (or attempt to purchase) sex acts from minors under third party control or from victims induced by force, fraud, threats, or coercion." Letter from John Cornyn (attached herewith).

Before the Supreme Court held that the sentencing guidelines were not mandatory, it was common for practitioners to argue that their client's conduct fell outside the heartland of the typical conduct chosen for prosecution under the guidelines at issue. That finding is no longer necessary for the sentencing court to vary from the suggested sentence in a particular case, but this case is no unusual in the constellation

of sex trafficking cases chosen for prosecution nationally that the argument demonstrates it to be essentially unique, and requiring an equally unique exercise of the Court's sentencing discretion.

The totality of the conduct contended to be criminal in this case consisted of fewer than a dozen sex acts with five females. The minors who participated in the conduct did so voluntarily, and Mr. Lazzaro sought out such relations only with females who were old enough to engage in consensual sexual relations. His attempt to conform his conduct to what the law permits seems to have fallen short only in his failure to anticipate that his largesse to his sexual partners after the fact could easily be construed as having been influenced by the sexual conduct itself. A sentence of 120 months is more than necessary for this first time offender.

Dated: 31 July 2023

Respectfully submitted,

DANIEL L. GERDTS, LAWYER

*s/* Daniel L. Gerdts

_____
Daniel L. Gerdts (#207329)
331 Second Avenue South, Suite 705
Minneapolis, MN 55401
612-800-5086
daniel@danielgerdtslaw.com

s/ Steven L. Kessler

_____
Steven L. Kessler, Esq.
Atty. Reg. No. 2086601 (NY)
Law Offices of Steven L. Kessler
500 Mamaroneck Avenue

Suite 320
Harrison, N.Y. 10528-1600
212-661-1500




www.cellebrite.com

## Extraction Report - Apple iPhone

### Participants


+1612███4112
estella*


+1612███8296

### Conversation - Instant Messages (20)

From: +1612███8296 (owner)
Do u have a second to talk
Status: Sent
Delivered: 9/24/2020 8:06:22 PM(UTC-5)

9/24/2020 8:06:22 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26A492 (Table: message, chat, Size: 3489792 bytes)

From: +1612███4112 estella
yeth what's up
Status: Read
Read: 9/24/2020 8:06:57 PM(UTC-5)

9/24/2020 8:06:31 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26A250 (Table: message, handle, chat, Size: 3489792 bytes)

From: +1612███8296 (owner)
Tmw night
Status: Sent
Delivered: 9/24/2020 9:52:01 PM(UTC-5)

9/24/2020 9:52:00 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26CB45 (Table: message, chat, Size: 3489792 bytes)



**DEFENDANT'S EXHIBIT**

CASE NO. _____

EXHIBIT NO. 6

From: +1612███8296 (owner)
It's happening
Status: Sent
Delivered: 9/24/2020 9:52:05 PM(UTC-5)

9/24/2020 9:52:04 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26C92F (Table: message, chat, Size: 3489792 bytes)

From: +1612____3296 (owner)
Period
Status: Sent
Delivered: 9/24/2020 9:52:07 PM(UTC-5)

9/24/2020 9:52:07 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26C70B (Table: message, chat, Size: 3489792 bytes)

From: +1612____4112 estella
NO WAYYYY OMFGGG
Status: Read
Read: 9/24/2020 9:52:11 PM(UTC-5)

9/24/2020 9:52:10 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26C4F1 (Table: message, handle, chat, Size: 3489792 bytes)

From: +1612____3296 (owner)
he said yes
Status: Sent
Delivered: 9/24/2020 9:52:11 PM(UTC-5)

9/24/2020 9:52:11 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26C2FE (Table: message, chat, Size: 3489792 bytes)

From: +1612____4112 estella
HE TEXted back?
Status: Read
Read: 9/24/2020 9:52:14 PM(UTC-5)

9/24/2020 9:52:14 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26DD7D (Table: message, handle, chat, Size: 3489792 bytes)

From: +1612____3296 (owner)
IK
Status: Sent
Delivered: 9/24/2020 9:52:15 PM(UTC-5)

9/24/2020 9:52:14 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26DF8D (Table: message, chat, Size: 3489792 bytes)

From: +1612____4112 estella
OMFGGGGGGGG
Status: Read
Read: 9/24/2020 9:52:17 PM(UTC-5)

9/24/2020 9:52:16 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26DB80 (Table: message, handle, chat, Size: 3489792 bytes)

2

From: +1612████3296 (owner)

YESSS

Status: Sent
Delivered: 9/24/2020 9:52:18 PM(UTC-5)

9/24/2020 9:52:17 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26D999 (Table: message, chat, Size: 3489792 bytes)

From: +1612████4112 estella

OMFGGGGGG

Status: Read
Read: 9/24/2020 9:52:19 PM(UTC-5)

9/24/2020 9:52:18 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26D783 (Table: message, handle, chat, Size: 3489792 bytes)

From: +1612████4112 estella

AHHHHHHHHHHH

Status: Read
Read: 9/24/2020 9:52:20 PM(UTC-5)

9/24/2020 9:52:20 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26D594 (Table: message, handle, chat, Size: 3489792 bytes)

From: +1612████4112 estella

BITCHHHHH O CANT WAIIIITTTTTT

Status: Read
Read: 9/24/2020 9:52:27 PM(UTC-5)

9/24/2020 9:52:26 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26D39F (Table: message, handle, chat, Size: 3489792 bytes)

From: +1612████3296 (owner)

he's excited abt it bro

Status: Sent
Delivered: 9/24/2020 9:52:27 PM(UTC-5)

9/24/2020 9:52:27 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26EF8D (Table: message, chat, Size: 3489792 bytes)

From: +1612████4112 estella

AHHHHHHHhhh

Status: Read
Read: 9/24/2020 9:52:29 PM(UTC-5)

9/24/2020 9:52:28 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26ED4D (Table: message, handle, chat, Size: 3489792 bytes)

3

From: +161█████13296 (owner)

Status: Sent
Delivered: 9/24/2020 9:52:37 PM(UTC-5)

9/24/2020 9:52:36 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26E973 (Table: message, chat, Size: 3489792 bytes)

From: +1612█████4112 estella

dude we're gonna have to put our freaky pants on with him so we can get paid more and so we can keep going back to get paid

Status: Read
Read: 9/24/2020 9:53:30 PM(UTC-5)

9/24/2020 9:53:03 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26E765 (Table: message, handle, chat, Size: 3489792 bytes)

From: +161█████04112 estella

Attachments:



Size: 136356
File name: IMG_4685.jpeg
IMG_4685.jpeg

Status: Read
Read: 9/24/2020 10:03:15 PM(UTC-5)

9/24/2020 10:03:00 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26E48B (Table: message, handle, chat, attachment, Size: 3489792 bytes)
Stella's iPhone/mobile/Library/SMS/Attachments/89/09/C608C532-7677-4EAA-BB48-C9937A47891/IMG_4685.jpeg :  (Size: 136356 bytes)

From: +1612█████3296 (owner)

Attachments:



Size: 124835
File name: 384F08C4-55BB-4D17-93D7-DD64B709F379-D70BDC51-E0E9-49F4-BB4D-9BDCBB2179E5.jpg
384F08C4-55BB-4D17-93D7-DD64B709F379-D70BDC51-E0E9-49F4-BB4D-9BDCBB2179E5.jpg

Status: Sent
Delivered: 9/24/2020 10:10:30 PM(UTC-5)

9/24/2020 10:10:28 PM(UTC-5)

Source Extraction:
Advanced Logical
Source Info:
Stella's iPhone/mobile/Library/SMS/sms.db : 0x26E22A (Table: message, chat, attachment, Size: 3489792 bytes)
Stella's iPhone/mobile/Library/SMS/Attachments/85/05/3C0AE23C-C02B-4B8F-B938-8C716BAE74E7/384F08C4-55BB-4D17-93D7-DD64B709F379-D70BDC51-E0E9-49F4-BB4D-9BDCBB2179E5.jpg :  (Size: 124835 bytes)

JOHN CORNYN
TEXAS

## United States Senate
WASHINGTON, DC 20510–4305

Dear Michayla,

Thank you for your interest in the Justice for Victims of Trafficking Act of 2015 (JVTA).

The JVTA law is critical in combating human trafficking by allowing federal law enforcement to charge the buyers of commercial sex acts from minors who are victims of trafficking. These children are manipulated by traffickers who target vulnerable children using a variety of manipulative methods and exploit them for financial gain.

The JVTA focuses on reducing the demand-side of the issue by charging the purchasers of these sex acts when they purchase (or attempt to purchase) sex acts from minors under third party control or from victims induced by force, fraud, threats, or coercion. Through comprehensive legislation, we can continue to combat human trafficking - the modern manifestation of slavery.

Once again, thank you for selecting the JVTA for your school project. Your interest in such a serious policy topic demonstrates a keen understanding of the issues. We want to wish you the best of luck in all your future endeavors.

Sincerely,

JOHN CORNYN
United States Senator